## SECURITY DRILLING CO. v. RATHKE OIL CO.

### No. 12531.

Court of Civil Appeals of Texas. Fort Worth. July 3, 1931.

Rehearing Denied Sept. 19, 1931.

Kilgore & Rogers, of Wichita Falls, for appellant.

Carrigan, King & Surles and Britain & Cheek, all of Wichita Falls, for appellee.

BUCK, J.

On August 17, 1929, H. A. Rathke, president of the Rathke Oil Company, sent the following letter to the Security Drilling Company:

"Security Drilling Company, Wichita Falls, Texas.

"Gentlemen: This is to advise you that we will purchase from you for a total consideration of $75,000.00 payable as hereinafter set out all of the physical assets of the Security Drilling Company which includes all of its producing and non-producing oil and gas leases, all of its personal property thereon situated or used in connection therewith, all of its drilling tools, standard rigs, tanks, pipe, lease houses, automobiles, trucks, and any and all other property whether herein listed or not, including its interest in an oil and gas producing lease in Hutchinson County, Texas. Said purchase shall be subject to approval of titles to said properties, the same to be good and merchantable titles. You to furnish abstracts or other evidence of such titles within three days and we will have three days for examination and approval. When said titles are approved and assignments, bill of sale or other evidence of title delivered to us we will pay said consideration as follows:

By cash on day of acceptance..... $10,000.00
By drilling contracts hereinafter
 further referred to............. 28,500.00
By assumption of notes payable.. 31,326.00
By transfer of stock owned by J. A.
 Rathke ...................... 5,174.00

"The drilling contracts referred to above are with Fain-McGaha Oil Corporation in Wilbarger County, Texas, worth $15,500.00; also with Duffey & Kaiser, et al. in Jack County worth $13,000.00. It is also understood and agreed that we will complete the well now drilling in Wilbarger County for Fain-McGaha Oil Corporation to its contract depth of 2,700 feet, providing the hole is in good condition at 7 A. M., August 19, 1929. We will also complete the Duffey & Kaiser well in Jack County by setting 6⅝" casing at 2950 feet with rotary tools and drilling same thereafter to 3,300 feet with cable tools, or such lesser depth as provided in your contracts. Failure to complete either of said wells will of course make it necessary for us to drill other wells in lieu thereof or pay to you the sums provided for on each contract in cash.

"The notes payable referred to in above list are as follows:

Wichita State Bank & Trust Co... $ 8,000.00
Producers Supply & Tool Co....... 17,726.26
Continental Supply Co........... 4,000.00
Oil Well Supply Co.............. 1,500.00

Total ..................... $31,326.26

"The stock referred to above is H. A. Rathke's stock in your company.

"This transaction shall become effective at 7 A. M. August 19, 1929, at which time we will be given the operation of said properties completely, including the responsibility for all bills or obligations thereafter incurred, and the collection of all revenue derived from such operation, thereafter.

"If the foregoing statement of our proposal is understood in full and agreed to by you, and if you will sell, and transfer to us all of said properties for the above consideration and conditions then please sign and return to us duplicate copy of this letter as evidence of your agreeing to all of its terms and conditions.

"Yours truly,
"Rathke Oil Company
"By: H. A. Rathke, President.

"The foregoing sale subject to all of the terms, conditions, and considerations mentioned herein is hereby accepted and agreed to by the undersigned.

"Security Drilling Company
"By B. J. Shaw, Vice President."

B. J. Shaw was the vice president and executive head of the Security Drilling Company and J. A. Rathke was the president and Chas. King was the secretary of the Rathke Oil Company.

When the time came for the casing to be furnished in drilling a well, the Rathke Oil Company tried to get the Security Drilling Company to furnish said casing, and later purchased and charged the cost thereof to the Security Drilling Company. On March 26, 1930, suit was filed for the alleged cost of the casing, alleged to be, together with the cost of pulling the casing out of well No. 1 and moving that part of the casing to well No. 2, and other expenses, in the total sum of $10,849.44.

In a rather lengthy pleading plaintiff sets up its cause of action and claimed that, under the contract as written and as accepted, the defendant was liable for the cost of the casing. This claim was denied by the defendant in a lengthy answer, consisting of some 29 pages of closely written matter. On September 29, 1930, plaintiff filed its trial amendment, in which it alleged that, if the contract on which it sued does not by its terms, expressly or impliedly, obligate defendant to furnish the casing for well No. 2, then, nevertheless, defendant is liable to plaintiff for the sums expended for said casing, less the reasonable value of the casing removed from well No. 1, for the reason that on October 5, 1929, and after plaintiff had commenced the drilling of said well No. 2, defendant then and there expressly agreed to furnish and pay for the necessary casing for drilling said well, and then and there authorized and empowered plaintiff to purchase same for its account, and then and there agreed to reimburse plaintiff for all sums expended therefor. Plaintiff further alleged that defendant agreed to assign and deliver to plaintiff certain purchase letters for acreage around said well as security for the payment of the sums so expended. That in pursuance of said authority and said agreement, plaintiff purchased the 15½", 12½", and the 10" casing described in its original petition and notified defendant of such purchase, which was then and there acquiesced in by defendant, and that, by reason of said agreement to reimburse plaintiff for the sums so expended, said defendant became bound and liable to pay plaintiff the sums paid for the casing.

Defendant filed an answer to the trial amendment, consisting of a general demurrer and a general denial. All exceptions by defendant to plaintiff's first amended original petition and to plaintiff's first trial amendment were overruled by the trial court.

The cause was tried before a jury, and, in answer to the special issues submitted, the jury found that (1) the defendant authorized plaintiff to purchase the necessary casing for drilling well No. 2 for its account, and agreed to reimburse plaintiff for all sums expended therefor; (2) that the reasonable value of all casing used by plaintiff in drilling said well No. 2 and the reasonable cost of unloading, drayage, and trucking expenses connected therewith was $16,690.20; (3) that the value of the casing lost in said well No. 2 was $11,671.84; (4) that the value of plaintiff's services and the use of its tools in pulling the casing from well No. 2 was $547.50; (5) that it was necessary to pull the casing from well No. 1 in order to preserve the same; (6) that the cost to plaintiff in employing a casing crew to pull the casing from well No. 2 was $400; (7) that the amount so expended for paying said casing crew was a reasonable sum for their services; (8) that it was necessary to pull the casing from well No. 1 in order to preserve the same; (9) that plaintiff expended for pulling the casing from well No. 1 $2,437, and said amount was a reasonable sum for said work; (10) that the reasonable charge per day for shutdown time was $90; (11) that the reasonable rental value of the casing used by plaintiff in drilling well No. 2 was $5,000; (12) that, under all the facts and circumstances then prevailing, it was not negligence for plaintiff to leave the tools in the hole, at the point, and for the time that such tools were so left.

Under the answers of the jury, the court rendered judgment in favor of plaintiff and

against defendant for $9,752.86, together with interest, which aggregate amount is made up of a difference between the value of the casing used by plaintiff in drilling well No. 2 and the reasonable cost of unloading, drayage, and trucking expenses connected with the handling of such casing, and the value of certain casing after being removed from well No. 2, and the reasonable value of plaintiff's services and the use of its tools in pulling the casing from well No. 2. From this judgment the defendant has appealed.

## Opinion.

Appellant has divided the alleged errors in three parts in its brief, and styled them substantive errors, procedural errors, and errors in rendition of judgment. On August 17, 1929, when plaintiff and defendant entered into the contract above noted, defendant was under contract with Duffey & Kaiser to drill the Jack county well, and said contract provided: "In the drilling of said well owners (Kaiser & Duffey) agree to furnish on racks at location all necessary casing needed by contractor in the drilling thereof and to have same delivered at location any time to prevent any delay to contractor. * * * With the exception of casing so to be furnished by owners and with the further exception of such tubing rods, pumping equipment, storage for production, contractor agrees at its sole cost and expense to furnish every other necessary item in the drilling of said well."

Although Duffey & Kaiser, the owners of the leases, who were having the well drilled, were under contract with defendant, the Security Drilling Company, yet the Rathke Oil Company did not agree to assume said contract, but merely agreed to drill the well. Plaintiff bought the assets of defendant, and agreed to drill the well, but did not assume the contract theretofore made by Duffey & Kaiser on the one hand and the Security Drilling Company on the other. The written proposal and the acceptance, for the proposal was accepted by the defendant company, does not expressly provide that defendant is to furnish the casing, nor that plaintiff is to furnish the casing. In fact it makes no reference whatever as to who is to pay for said casing. In its trial amendment plaintiff alleged that on or about October 5, 1929, after it had commenced the drilling of well No. 2, defendant then and there expressly agreed to furnish and pay for the necessary casing for drilling said well, and then and there authorized and empowered plaintiff to purchase same for its account, and then and there agreed to reimburse plaintiff for all sums expended therefor. That in pursuance of said authority and said agreement plaintiff purchased the 15½", 12½", and 10" casing described in plaintiff's amended petition, and notified defendant of such purchase, which

was then and there acquiesced in by defendant.

Chas. King testified in part as follows:

"When they started moving the pipe from the well, we were drilling, and we had to have 15½" pipe immediately because you had to set it at about 350 feet, and I think we were about 175 feet down when they started moving the pipe, and so I made a request of Shaw that the pipe be arranged for and he told me that they had not yet secured it, and could not make arrangements, and that they did not have the money, and I made the suggestion that whatever bottom of the hole letters he had, or which the Security was entitled to, that the letters be assigned to the Rathke Oil Company as security for the purchase of the pipe to the Rathke Oil Company; the Security Drilling Company was liable and responsible to us for pipe to drill the well with, and that we could go ahead and purchase this pipe and use it and not delay the drilling of the well, and use the bottom of the hole letters as collateral with which to pay for it.

"Mr. Shaw said that would be the thing to do, go ahead and buy the pipe for the Security Drilling Company, and that the bottom of the hole letters would be assigned by him to us and—that was somewhere about the 10th of October, somewhere in that neighborhood, the day that I discussed this matter with Shaw, the time I talked to him about the assignment of the bottom of the hole letters [It is explained that the bottom of the hole letters means that, when a well is drilled and reaches a certain depth, other oil companies desiring to develop or test that locality agree to pay to the one drilling the well, or having it drilled, a certain amount, and that the driller of the well gets the benefit of said payments.] to us as security. He was figuring on leaving that day for an extended trip and my discussion was with him in the forenoon, and he said, now, I will have to see Kilgore as to how the letters can be assigned to you, these bottom of the hole letters, as to how they can be assigned to you, as security for the purpose of security for purchasing the pipe, and I will let you know as soon as I find out and he was supposed to have let me know that day and along in the afternoon I had not heard from him, and I called the office, and I was informed by the office that Mr. Shaw had left town, and I asked the man in the office if he had made any arrangements about delivery of the bottom of the hole letters to us, and so we could go ahead and purchase the pipe on behalf of the Security, and use the letters as collateral in paying for the pipe, and he said, so far as he knew Mr. Shaw had not left any letters and he did not know anything about it; I went down to talk to Mr. Kilgore about it, and told him that Shaw and I had agreed upon the matter, and that

we had talked about these letters being assigned to us that day, and that Mr. Shaw had agreed to do it, and said that he was going to Mr. Kilgore and see about how it should be done, and Mr. Kilgore said, now, he has got.away, the only thing would be to wire him and get authority for someone else to assign them to you, and I went back and talked to the man in the Shaw Oil Company office, and he said he did not know where we could get hold of Mr. Shaw but he was expecting a telegram from him the next day or so, and Kilgore said we could find out where he was and wire and explain and let him wire authority back for Kilgore to assign the letters back to us and so it rocked along about five or six days, before we heard from Shaw; he had gone East somewhere, and if his office had heard from him I did not find it out; anyway they told me they were not in touch with him. When five or six days had elapsed and they did finally hear from him they figured that he would be back in about ten days time, and I said we will let it go until he gets back, if he is not going to be gone over ten days, for more than half of the time has already elapsed. Mr. Shaw came back considerably after that, he was gone much longer than ten days. * * * ₐDuring the course of time that he was gone we had to purchase this pipe, and I think it was delivered to us some time during that time. Mr. Bonds happened in my office one day and I, in the course of our discussion and conversation about first one thing and another, this pipe question came up, and Mr. Bonds made some such statement, that I, of course told him that the Security was responsible to us for the pipe and Shaw was going—I would not say whether I told him Shaw was going to assign those letters to us or not, but I talked to ——— and Mr. Bonds said that he did not understand that the Security was going to have to furnish this pipe, and when Shaw came back, I immediately went to the office, and I recalled our former conversation about the bottom of the hole letters being assigned to us, and he said, yes, he got away without doing that and he would go and see Mr. Kilgore and arrange to have that done right away. * * * Mr. Bonds raised some question about whether the Security was responsible for the pipe and Mr. Shaw then said that he would do that—that Mr. Bonds did not know anything about the details of the trade; and that the Security was absolutely responsible to the Rathke Oil Company for the pipe and he would see we were paid for it."

 We think this testimony, and other testimony to the same effect, supports the conclusion evidently reached by the jury that the defendant authorized the plaintiff to purchase the necessary casing for drilling. It is this finding of the jury, based upon sufficient evidence, upon which the judgment rests. But appellant urges that there was no consideration for this promise. A valuable consideration may be either a benefit to the promisor or a detriment to the promisee. Again, to constitute a consideration, either some benefit must flow to, or some injury must be received by, one or other of the parties. The promisor receives a benefit when, in return for his promise, he acquires some legal right to which he would not otherwise have been entitled, and the promisee suffers detriment when, in return for the promise, he forbears some legal right which he otherwise would have been entitled to exercise. 10 Tex. Jur. p. 122, § 71.

In 6 R. C. L. p. 654, par. 67, it is said: "A long series of decisions has established the rule that a benefit to the promisor or a detriment to the promisee is a sufficient consideration for a contract." See, also, 13 Corpus Juris, p. 315.

In Brannon v. Lancaster Bros., 8 S.W.(2d) 726, this court, in an opinion by the writer, upheld the consideration where, in the foreclosure of a deed of trust, adverse creditors stated that they would apply for receivership, certain ones claiming liens; the promise of the holder of a deed of trust to pay such debts was based on a sufficient consideration. See, also, McNeill v. Simpson (Tex. Civ. App.) 24 S.W.(2d) 485, and collation of numerous recent decisions in 3 R. C. L. p. 1782.

 A forbearance of any legal right may be a consideration. Page on Contracts, vol. 1, p. 918, § 546. In Mayfield v. Eubank (Tex. Civ. App.) 278 S. W. 243, 246, attack was made on the consideration for the release of an heir of her prospective rights in her father's estate. The consideration was upheld in the following language: "But it is not required, in order to constitute a valid consideration for an executory contract such as that involved in this controversy, that the promisor should receive a benefit. It is sufficient if the promisee has parted with some legal right, or has sustained a legal injury, as an inducement for the promise which is sought to be enforced"—citing cases.

 In plaintiff's trial amendment it was alleged that defendant was to furnish casing for the well in controversy, and further alleged that, if the contract did not in its terms so provide; nevertheless that was the intention of the parties to the contract, and alleged that the contract was ambiguous, and did not state the true agreement of the parties, and that the same was procured by accident and mutual mistake. It will be remembered that the casing from well No. 1 was already at the well at the time this contract was made between plaintiff and defendant, but was later removed when well No. 2 was begun. Some contract had been made by Duffey & Kaiser with a supply concern, and Duffey & Kaiser had authorized the concern

to remove the casing. The contract as written provided that failure to complete either of said wells would make it necessary for plaintiff to drill other wells in lieu thereof or pay the amount agreed to be paid for a failure to drill. This meant, at most, that plaintiff should drill the well under the same circumstances required in the drilling of well No. 1, wherein all of the casing was furnished to the driller. Both parties evidently contemplated that plaintiff would have the right to use the casing from well No. 1 in the drilling of well No. 2. Something not within the contemplation of either party arose. An unforeseen condition and hardship was encountered. The owners of the pipe, with the consent of Duffey and Kaiser, removed the casing from the location and left plaintiff without any casing whatever with which to drill the well. Both plaintiff and defendant knew that plaintiff was not to furnish the casing. Defendant was contending that Duffey & Kaiser were to furnish the casing. All the facts show that plaintiff was contending that, so far as it was concerned, it was up to the defendant to furnish the casing to it. When the casing was taken away, plaintiff undoubtedly had the right to terminate the contract and pay the $13, with the right of reimbursement for what it had already done in well No. 2, and in pulling the casing from well No. 1. The agreement alleged to have been made by the defendant company, and shown to have been made by the executive head thereof, B. J. Shaw, that plaintiff had the right to purchase for defendant the casing needed, was a decided benefit to defendant in complying with the contract with Duffey & Kaiser and relieved itself from the almost certain consequences of a lawsuit. As stated by A. J. Mixon, secretary of the defendant corporation: "As to whether I would have had a law suit, I don't know. I don't think we could have got out of the contract. We had a contract to drill a well, and that well was to be completed." Therefore, the element of benefit to the promisor is presented and the further element of detriment to the promisee is present. The plaintiff, in purchasing the casing for defendant's account, waived its right or option to terminate the contract and to go on with the drilling, which, under the authorities, is an adequate consideration for defendant's promise. Defendant knew, both verbally and by repeated letters, that plaintiff was purchasing and provided the casing for defendant's account, for more than three months up to November 21, 1929. Defendant did not even reply thereto, and never did deny its obligation thereon until December 20, 1929, when plaintiff had practically completed the drilling of said well.

We think that there was sufficient consideration to support the promise of defendant to allow plaintiff to purchase the necessary casing on defendant's account.

 Objection is leveled at the introduction of certain testimony of Chas. King, secretary of plaintiff company, on the ground that it calls for a conclusion of the witness, and an interpretation of a written contract which is clear and unambiguous on its face. We do not think that this assignment should be sustained, inasmuch as Chas. King only testified as to what the attitude of the plaintiff company was with reference to controversies that had arisen between the two corporations. We think that the evident finding of the trial court that the contract was ambiguous is sustained by the evidence.

We have examined the issues submitted and the objections made by the defendant below to the submission of said issues, but do not find any merit in said objections.

We have gone somewhat carefully over this case and conclude that no reversible error is shown. Therefore all assignments of error are overruled, and the judgment is affirmed.